# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### July 24, 2012 Session

## STATE OF TENNESSEE v. DAVID EARL SCOTT

**Appeal from the Criminal Court for Knox County**
**No. 92765     Mary Beth Leibowitz, Judge**

---

**No. E2011-00707-CCA-R3-CD - Filed November 14, 2012**

---

The defendant, David Earl Scott, appeals his Knox County Criminal Court jury convictions of especially aggravated kidnapping, aggravated kidnapping, attempted voluntary manslaughter, and aggravated assault, claiming that the evidence is insufficient to support his convictions, that his kidnapping convictions run afoul of the precedent set in *State v. Anthony* and its progeny, and that the sentence imposed by the trial court is excessive. Because the evidence of serious bodily injury was insufficient, the defendant's conviction of especially aggravated kidnapping is reversed and modified to a conviction of aggravated kidnapping, and the sentence is modified from 25 years to 12 years. The judgments of the trial court are affirmed in all other respects.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed in Part; Reversed and Modified in Part**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which ROGER A. PAGE, J., joined. ROBERT W. WEDEMEYER, J., filed a dissenting opinion.

Kevin Angel, Oak Ridge, Tennessee, for the appellant, David Earl Scott.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Leslie Nassios, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The convictions in this case relate to events that transpired between the defendant and his estranged wife, Nikole Scott, on July 25, 2009.

At trial, Ms. Scott testified that she met the defendant in 1990, when she was 17 years old and living in Cary, North Carolina. The couple had their first child in 1995, married in 1996, and had three more children together. They moved to Knoxville in 2007. She worked full-time while the defendant, she said, contributed to the family finances via his disability income. Ms. Scott testified that the marriage was rocky, and the couple went through a year-long separation in 2006 and another separation beginning in February 2009. On February 23, 2009, Ms. Scott obtained an order of protection to prevent the defendant from coming near her. Although they were not yet divorced, they were still living apart and the order of protection was still in effect at the time the offenses in this case occurred on July 25, 2009.

Ms. Scott testified that she went to bed sometime around midnight on July 24, 2009, and that three of her children slept in the bed with her. The fourth, her oldest son, spent the night with a friend. She said that the defendant telephoned her at approximately 1:00 a.m. and "was saying that [they] needed to talk. . . . that [they] needed to be back together and what was [she] going to do about the order of protection." She told him that she was not going to "reverse the order," and the defendant became angry and said, "'Well, I'm gettin' in the car; I'm comin' over; I'm comin' over.'" She told him not to come over because she was in the bed and the children were asleep. Despite her pleas, the defendant arrived at her residence at approximately 1:30 a.m. and began pounding on the door. Ms. Scott recalled that the two were still on the telephone when the defendant said, "'I'm here. Don't you hear me? You need to come down and let me in.'" She said that she told the defendant, who did not have a key to the residence, to leave.

The defendant did not leave, however, and Ms. Scott finally agreed to talk to him on the patio of the home. She said that she sat down at the patio table, lit a cigarette, and the two "[s]tarted to" talk before the defendant suddenly "got up and . . . ran into the house and locked the door." Ms. Scott testified that she pleaded with the defendant to unlock the door, and he finally relented. She said that as soon as she entered the house, he ran upstairs, directly into the master bedroom where the children were sleeping. She said that the defendant told her that he was "lookin' to see who was in our bed." She described what happened next:

> I went to go grab for my phone or something. I think . . . my cell phone was in there and I went . . . to get it, and he went to grab it. And so then I followed him out of the room and went around and he went like towards the bathroom, . . . because I think he must have been looking for [our oldest son] to see if [he] was here. Um, he pushed me into the bathroom and shut the door. And I opened the door to come out and he looked at

me again and he was telling me, "I need you to stay in the bathroom." And he . . . pushed me by the shoulders and just slammed me as hard as he could. That's when I hit my tail bone and then I . . . remembered like slow motion, but my head just – it hit the back of the floor. Um, I got up anyway and came – and got up cause he had walked away and followed him downstairs.

Ms. Scott testified that at that point she asked the defendant if he was there to talk, and the two sat at the table. The defendant then began "going through [her] phone . . . wanting to see who [she] was talking to on [her] phone." After he finished, he turned on the garbage disposal and acted as though he was going to put the cellular telephone into the disposal. He did not do so, however, and he picked up the cordless telephone associated with the land line and scrolled through the list of numbers. After he finished, he kept both phones in his possession. She said that the defendant then began to question her about the owner of a particular number. She told him it belonged to her friend Joe, a man she met while working at "BMW." Ms. Scott recalled that upon her revelation, the defendant struck her and said, "'This is what aggravated assault is.'" He then struck her repeatedly.

Ms. Scott said that the next thing she recalled was waking up on the floor and begging the defendant not to hit her again. The victim said that she did not know how long she was unconscious. The defendant responded to her pleas by taking her into the walk-in pantry and shutting the door behind them. She said that the defendant threatened her with "a big skewer for the grill" before beginning to strangle her. She said, "[I]t felt like the front of my throat was hitting the back of my neck. . . . I thought that's it; I'm done." Ms. Scott testified that the defendant stopped strangling her at some point and dragged her back into the upstairs bathroom, where he struck her hard in the nose, causing it to bleed. The defendant then turned on the water in the tub and asked, "'Don't you think drowning's a good way to die?'" At that point, the defendant wrapped his belt around the victim's neck. When she managed to free herself from the belt, the defendant wrapped an electrical cord around her neck.

Ms. Scott testified that the defendant stopped what he was doing when one of the children called for her. She said that she went to the bedroom, gave the child a drink, turned on the television, and told the children to stay in the bedroom. She and the defendant then went downstairs, where the defendant permitted Ms. Scott to smoke a cigarette before taking her into the garage and ordering her onto her knees. He ordered her to place her hands behind her neck and attempted to bind her hands with "weed eater cord." Ms. Scott said that when he was unable to bind her hands, they went back inside the house. Once inside, Ms. Scott saw that her youngest daughter had gotten up. She said that she picked the little girl

up and "just held onto her" while sitting in the recliner. The defendant sat in the floor and began telling her his plans for the next day. She said that he would occasionally stop during the middle of the conversation and say, "'You know I have no conscience.'"

Ms. Scott testified that at approximately 5:00 a.m., the defendant insisted that they go to bed. He forced the victim upstairs and into the master bed, placing the victim's cellular telephone and the cordless telephone underneath the mattress on his side of the bed. Ms. Scott said that the defendant held her little finger for the entire two hours that they lay in bed. After two hours, she got up and began to get ready for the day, hoping to seek refuge at some point with the defendant's mother. When the police arrived at her door a short time later, however, she told the children to run away. She said that she ran with the children to her neighbor's back door and begged for refuge. The victim said that the defendant had telephoned her friend Joe twice during the evening and that it was Joe who telephoned police because he feared for her safety. Ms. Scott testified that she and Joe had been dating since February 2009 and that he had helped her when she had to flee from the defendant on a previous occasion.

Ms. Scott testified that she did not leave the house earlier because she was afraid of the defendant and because she did not want to leave her children behind. She said that she did not telephone police when he first arrived because she "didn't want to make things worse on what he already had going on" and because she was close to the defendant's mother and sister.

Ms. Scott testified that as a result of the manual strangulation, she had a sore throat, bloodshot eyes, and marks on her neck. As a result of being struck in the face and head, she could eat only soft foods for two weeks and her face was "bruised black and blue, swollen, very swollen." She said she suffered a whiplash-like injury to her neck as a result of the repeated blows to her face. She also suffered a very deep bruise to her tail bone that made walking and sitting difficult. Ms. Scott said that she had bruising on her arms, hips, and back. She testified that despite her injuries, she returned to work on the following day because she "made an hourly wage and . . . had to work."

During cross-examination, Ms. Scott admitted that she had seen the defendant earlier that day when she went to pick up the children from his mother's house. She said that she did not tell the defendant that she was dating and admitted that she knew that the defendant desired reconciliation. She also admitted that she followed the defendant upstairs when he first entered the home, but she explained that she did so because she wanted him out of the house. Ms. Scott said that she kept suggesting that they talk in an attempt to diffuse the situation. She admitted that she did not intend to leave the house because she did not want to leave the children with the defendant. Ms. Scott conceded that although she was sure

-4-

that she lost consciousness, she did not know for how long. She admitted that she did not ask the defendant to leave as they sat in the living room before going to bed because she just wanted to wait the encounter out.

Ms. Scott acknowledged that when they got up the following morning, she prepared breakfast for the kids, got them dressed for the day, and got herself dressed for the day. She also admitted that she wanted to go with the defendant to his mother's house, explaining that she "felt like it would be an end to this situation." She said that she could not telephone police because the defendant had removed the telephone cord from the wall jack and retained possession of her cellular telephone.

Knox County Sheriff's Office ("KCSO") Crime Scene Investigator Aaron Allen testified that he arrived at Ms. Scott's residence at 8:50 a.m. and that he took photographs of the victim, the defendant, and the scene. He recalled that the defendant had bruising on his arm. The victim had bruising on her face, neck, arms, hands, legs, and back. He said that there was blood on the victim's night shirt and on the toilet in the hall bathroom. A towel in the bathroom had a pinkish hue, and the room "reeked" of bleach. Deputy Allen recalled that there was a small amount of water in the tub. When he went back later in the day, the house had been cleaned and the water let out of the tub.

Knox County Emergency Management Service records manager Michael Mayes testified that a 9-1-1 call from Joseph McDanold requesting service at 1524 Madison Oak Road came in at 7:44 a.m. on July 25, 2009. An audio recording of the call was played for the jury.

KCSO Family Crisis Unit Officer Lisa Williams testified that she contacted the victim by telephone after the report of offenses in this case. She said that she attended a hearing with the victim on August 4, 2009, and at that time the victim still had bruising around her face, throat, and jaw and that her eyes showed evidence of petechia.

KCSO Deputy Frank Phillips responded to Mr. McDanold's 9-1-1 call. Deputy Phillips testified that he had responded to "easily a thousand" domestic violence calls and that this case stood out in his mind because of the severity of the victim's injuries. He said that the victim "was very disorganized, very scared, almost in a panic state. She had numerous bruises around her face and neck area." The victim did not wait for detectives to arrive but was instead taken to the hospital via ambulance.

At the conclusion of Deputy Phillips' testimony, the State rested. Following a *Momon* hearing, the defendant elected not to testify. He presented the testimony of his mother, Betty Scott, who testified that on July 25, 2009, she planned to have a yard sale and

telephoned the defendant sometime between 6:30 and 7:00 a.m. The defendant offered to let the victim speak to her, but the victim declined.

Based upon the foregoing, the jury convicted the defendant as charged of one count of especially aggravated kidnapping, three counts of aggravated kidnapping, and one count of aggravated assault. On the charged offense of attempted second degree murder, the jury convicted the defendant of the lesser included offense of attempted voluntary manslaughter.

Following a sentencing hearing, the trial court merged the defendant's convictions of aggravated kidnapping into the conviction of especially aggravated kidnapping and imposed a total effective sentence of 35 years' incarceration.

The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal. In this appeal, the defendant challenges the sufficiency of the convicting evidence, the propriety of his kidnapping convictions under *State v. Anthony* and its progeny, and the length of the sentence imposed. We consider each claim in turn.

*I. Sufficiency*

The defendant contends that the evidence adduced at trial was insufficient to support his convictions of especially aggravated kidnapping, aggravated kidnapping, and attempted voluntary manslaughter. We review the defendant's claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, especially aggravated kidnapping is "false

imprisonment, as defined in § 39-13-302 . . . [w]here the victim suffers serious bodily injury." T.C.A. § 39-13-305(a)(4) (2006). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." *Id.* § 39-13-302(a). "'Serious bodily injury' means bodily injury that involves: (A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." *Id.* § 39-11-106(34). Aggravated kidnapping, as charged in the three counts against the defendant, "is false imprisonment, as defined in § 39-13-302, committed . . . (1) To facilitate the commission of any felony or flight thereafter; . . . (3) With the intent to inflict serious bodily injury on or to terrorize the victim or another." *Id.* § 39-13-304(a)(1), (3).

### *A. Serious Bodily Injury*

The defendant challenges the sufficiency of the evidence to support his conviction of especially aggravated kidnapping, arguing that the State failed to establish that the victim suffered serious bodily injury. The State contends that the record establishes that the victim suffered injuries in each of the categories enumerated as serious bodily injury.

The State initially points to the defendant's strangling the victim to the point of unconsciousness as evidence of serious bodily injury, arguing that the strangulation carried a substantial risk of death. The record, however, does not support the State's assertion that the defendant choked the victim "until she was unconscious." The victim testified that she lost consciousness only once during the encounter with the defendant, just after he struck her while they were in the kitchen. Although she could not recall how or why the defendant stopped strangling her or how they got out of the pantry, she did not testify that she lost consciousness during the strangulation attempt.

As for the State's argument that the defendant's attempt to strangle the victim "alone carries a substantial risk of death," our supreme court recently addressed the level of proof required to establish serious bodily injury by showing a substantial risk of death. In *State v. Michael Farmer and Anthony Clark*, No. W2009-02281-SC-R11-CD (Tenn. Aug. 22, 2012), a case involving a gunshot wound to the victim's thigh, the supreme court held "that in determining whether there was a 'serious bodily injury' based on a 'substantial risk of death,' [a reviewing court] must look to the injury that occurred rather than the injury that could have occurred or the manner in which it occurred." *State v. Michael Farmer and Anthony Clark*, ___ S.W.3d ___, No. W2009-02281-SC-R11-CD, slip op. at 6 (Tenn. Aug. 22, 2012). Although the victim testified that she had a sore throat and blood-shot eyes as a result of the defendant's attempting to strangle her with his hands, no proof showed that the sore throat or blood-shot eyes entailed a substantial risk of death. Similarly, no proof showed

-7-

that any of the victim's remaining injuries, which she enumerated as primarily bruising and lingering soreness, carried a substantial risk of death.

The State, at trial, pointed to the victim's loss of consciousness as proof that she suffered serious bodily injury. The defendant argues that no proof showed that the victim's loss of consciousness was "protracted" as required by the Code. Given its natural and ordinary meaning, "'[p]rotracted' is an adjective used to describe something that is delayed or prolonged in time." *State v. Derek Denton*, No. 02C01-9409-CR-00186, slip op. at 10 (Tenn. Crim. App., Jackson, Aug. 2, 1996) (citing *Merriam Webster's Collegiate Dictionary* 939 (10th ed. 1994); *American Heritage Dictionary* 568 (1975)). Here, the victim testified that she lost consciousness after the defendant struck her while the couple was in the kitchen. She said that she did not know how long she was unconscious but, upon vigorous cross-examination, admitted that she did not believe it to have been for a long period of time. The brief loss of consciousness described by the victim does not satisfy the definition of "protracted unconsciousness" required to establish serious bodily injury.

The State also argues that the victim suffered from extreme physical pain as a result of the injuries she received at the hands of the defendant. In *State v. Michael Farmer and Anthony Clark*, our supreme court cited with approval this court's opinion in *State v. Sims*, 909 S.W.2d 46 (Tenn. Crim. App. 1995). In *Sims*, acknowledging the difficulty of quantifying physical pain, we used the *ejusdem generis* canon of statutory construction to determine that the pain necessary to establish serious bodily injury via extreme physical pain "must be enough to be in the same class as an injury which involves a substantial risk of death, protracted unconsciousness, protracted or permanent disfigurement or the loss or impairment of the use of a bodily member, organ or mental faculty." *State v. Sims*, 909 S.W.2d 46, 49 (Tenn. Crim. App. 1995). We held that the pain associated with the injury to Sims's victim, a broken nose, did not qualify as "extreme physical pain" for purposes of the definition of serious bodily injury.

Turning to the facts of this case, the victim testified that injuries to her jaw made it painful to eat anything other than soft foods for a short period of time, that the repeated blows to her face caused a "whiplash"-like injury to her neck that was "really sore" for several days, and that an injury to her tail bone from being slammed to the floor made walking up stairs and sitting very uncomfortable. She also testified that her throat was sore as a result of the defendant's attempt to strangle her with his hands. When treated in the emergency room, the victim classified her pain level as five on a scale of ten. Although compelled by her financial situation, the victim returned to work immediately and did not miss any work as a result of her pain. Although the victim certainly suffered pain as a result of injuries inflicted by the defendant, no proof established a basis for the jury's conclusion that the victim's pain was extreme enough to elevate her injuries to serious bodily injury.

The State also asserts that the bruising to the victim's face and neck, which was visible 11 days later when she was observed by Ms. Williams, qualifies as protracted disfigurement. We cannot agree, however, that bruising alone can qualify as disfigurement for purposes of Code section 39-11-106 because that section specifically includes bruising in the definition of "bodily injury." *See* T.C.A. § 39-11-106(4) ("'Bodily injury' includes a cut, abrasion, *bruise*, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty.") (emphasis added). Because bruising is specifically included in the statutory definition of bodily injury among a class of injuries that also includes "disfigurement," it cannot be included in the more general term "disfigurement" in the definition of serious bodily injury.

Finally, the State claimed at trial that the difficulty that the victim experienced in walking and sitting as a result of the injury to her tail bone qualified as the "protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." Again, we cannot agree. As indicated above, protracted means "delayed or prolonged in time." None of the victim's injuries qualified as protracted. Moreover, nothing in the record supports a conclusion that the function of the victim's bodily members was substantially impaired. Although the victim testified that walking and sitting was painful for "[a]t least a week," she did not testify that she was unable to walk or sit. Indeed, she testified that she was able to return to work immediately despite her injuries.

Because the State failed to establish that the victim suffered serious bodily injury, the defendant's conviction of especially aggravated kidnapping must be modified to a conviction of aggravated kidnapping. *See* T.C.A. § 39-13-304(a)(4) ("Aggravated kidnapping is false imprisonment, as defined in § 39-13-302, committed . . . [w]here the victim suffers bodily injury[.]").

*B. Aggravated Kidnapping*

The defendant challenges his convictions of especially aggravated kidnapping and aggravated kidnapping on grounds that the State failed to prove that the victim was falsely imprisoned. The State contends that the actions of the defendant in moving the victim from room to room and terrorizing her through physical violence and verbal threats substantially interfered with her liberty. We agree with the State.

As indicated earlier, "[a] person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." *Id.* § 39-13-302(a). Here, the defendant forcibly confined the victim inside a bathroom, a pantry, and a garage, all while assaulting her verbally and physically. Although the defendant points to the victim's testimony that she did not intend to leave the

house as proof that she was not held against her will, the record establishes that the victim did not leave even when she might have done so because she feared for the safety of her children, who were asleep inside the home. In addition, she testified that she was terrified of the defendant after being beaten, choked, and moved about within the home. The defendant also took control of the victim's only means of communication with the outside world. This evidence sufficiently established that the defendant confined the victim so as to substantially interfere with her liberty.

Moreover, the evidence also establishes that the defendant confined the victim "[t]o facilitate the commission of any felony or flight thereafter" and "[w]ith the intent to inflict serious bodily injury on or to terrorize the victim or another." In consequence, the defendant is not entitled to relief on this issue.

### C. Attempted Voluntary Manslaughter

The defendant also challenges the sufficiency of the evidence supporting his conviction of attempted voluntary manslaughter, arguing that "there is not enough evidence in the record to make the [defendant's] entire course of conduct rise to the level of an attempted homicide." The State avers that the defendant's use of violence against the victim, the severity of the injuries she received, and his expressed intent to drown her in the bathtub support a conviction of attempted voluntary manslaughter.

"Voluntary manslaughter is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." *Id.* § 39-13-211(a).

> A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

*Id.* § 39-12-101(a).

Here, the defendant came to the victim's residence despite her pleas that he stay away and despite that a valid order of protection enjoined him from having any contact with the victim. He entered the home via trickery and, once inside, began to brutalize the victim

-10-

within a short period of time. Angered by her desire for separation and her revelation that she had been speaking on the telephone to man she met at work, the defendant beat the victim with his fists, choked her with his hands and with an electrical cord, threatened her with a barbecue tool, and asked her, as he ran water into the bathtub, if she thought drowning would be a pleasant way to die. In our view, this evidence more than sufficiently established that the defendant acted with intent to kill the victim and that he completed a substantial step toward doing so. Indeed, the record establishes that it was only the interruption occasioned by the parties' youngest child that thwarted the defendant's efforts. The defendant is not entitled to relief on this issue.

## II. Anthony Issue

The defendant asserts that the State failed to establish that the removal or confinement of the victim went beyond that necessary to commit either of the accompanying felonies and that, as a result, his convictions of especially aggravated kidnapping and aggravated kidnapping must be dismissed as violative of principles of due process. The State contends that the convictions do not violate the defendant's due process rights.

### A. State v. Anthony and Progeny

In *State v. Anthony*, 817 S.W.2d 299 (Tenn. 1991), our supreme court for the first time considered "the propriety of a kidnapping conviction where detention of the victim is merely incidental to the commission of another felony, such as robbery or rape." *State v. Anthony*, 817 S.W.2d 299, 300 (Tenn. 1991). The high court acknowledged that a period of confinement technically meeting the definition of kidnapping frequently accompanies such crimes as robbery and rape and concluded that a separate kidnapping conviction cannot be supported when "the confinement, movement, or detention [was] essentially incidental to the accompanying felony." *Anthony*, 817 S.W.2d at 305. Specifically, *Anthony* required reviewing courts to determine "whether the confinement, movement, or detention is essentially incidental to the accompanying felony and is not, therefore, sufficient to support a separate conviction for kidnapping, or whether it is significant enough, in and of itself, to warrant independent prosecution and is, therefore, sufficient to support such a conviction." *Id.* at 306.

Since its decision in *Anthony*, the supreme court has issued a series of cases addressing the ruling. First, in *State v. Dixon*, 957 S.W.2d 532 (Tenn. 1997), the court observed:

> *Anthony* and its progeny, however, are not meant to provide the rapist a free kidnapping merely because he also committed rape.

The *Anthony* decision should only prevent the injustice which would occur if a defendant could be convicted of kidnapping where the only restraint utilized was that necessary to complete the act of rape or robbery. Accordingly, any restraint in addition to that which is necessary to consummate rape or robbery may support a separate conviction for kidnapping.

*Id.* at 534-35. The *Dixon* court also added a second level of inquiry to the *Anthony* analysis, concluding that where the confinement is beyond that necessary for the accompanying felony, a court must next determine "whether the additional movement or confinement: (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm." *Id.* at 535. Finally, the *Dixon* court emphasized that the focus of any *Anthony* inquiry should be on "the purpose of the removal or confinement and not the distance or duration." *Id.*

The supreme court again revisited *Anthony* in the context of a kidnapping conviction in *State v. Fuller*, 172 S.W.3d 533 (Tenn. 2005), wherein the court emphasized that "'the determination of whether a detention or movement is incidental to another offense is highly dependent on the facts in each case.'" *State v. Fuller*, 172 S.W.3d 533, 538 (Tenn. 2005) (quoting *Anthony*, 817 S.W.2d at 306). The court also ruled that the *Anthony* test is not "outcome determinative," noting that the victim in *Fuller* had been able to summon help despite being bound with duct tape. Then, in *State v. Richardson*, 251 S.W.3d 438 (Tenn. 2008), the supreme court completely abandoned the "essentially incidental" analysis of *Anthony* and replaced it with the two-part test established in *Dixon*:

The *Dixon* two-part test fully replaces the *Anthony* "essentially incidental" analysis. As we previously have observed, the *Dixon* test "provides the structure necessary for applying the principles announced in *Anthony*." Although we adhere to the due process principles adopted in *Anthony*, we now make clear that the *Anthony* analysis should not be used in conjunction with the *Dixon* two-part test. The *Dixon* test should be used exclusively in all future inquiries.

*Id.* at 443 (citation omitted). The court emphasized, "[N]o bright line exists for making the threshold determination in the first prong of the *Dixon* test. The inquiry is fact-driven." *Id.*

*B. State v. White*

Most recently, in *State v. White*, 362 S.W.3d 559 (Tenn. 2012), our supreme

-12-

court again addressed the precedent originally developed in *Anthony* and held "that whether the evidence, beyond a reasonable doubt, establishes each and every element of kidnapping, as defined by statute, is a question for the jury properly instructed under the law." *State v. White*, 362 S.W.3d 559, 577 (Tenn. 2012). In so holding, the court expressly overruled *Anthony*, *Dixon*, and all their progeny, specifically concluding that "[t]he separate due process test articulated first in *Anthony*, and subsequently refined in *Dixon* and its progeny, is, therefore, no longer necessary to the appellate review of a kidnapping conviction accompanied by a separate felony." *Id.* at 578. Instead, the court held, the jury's finding beyond a reasonable doubt all the elements of kidnapping coupled with the reviewing court's "task . . . of assessing the sufficiency of the convicting evidence" is sufficient to protect the defendant's due process rights. *Id.* The court determined that the inclusion of false imprisonment, which requires that removal or confinement substantially interfere with the liberty of another, as a "'building block'" for all kidnapping convictions under the current version of the Code prevents the criminalizing of the type of "trivial restraints" contemplated by *Anthony* under the previous version of the kidnapping statutes. *Id.* at 576.

Although it overruled the line of cases that required a legal, as opposed to a factual due process evaluation, the court retained the requirement that the State establish that the removal or confinement of the victim went beyond that necessary to accomplish the accompanying offense, classifying it as a question of fact to be determined by a jury "properly instructed under the law." *Id.* at 577. Given this holding, the court determined that

> [w]hen jurors are called upon to determine whether the State has proven beyond a reasonable doubt the elements of kidnapping, aggravated kidnapping, or especially aggravated kidnapping, trial courts should specifically require a determination of whether the removal or confinement is, in essence, incidental to the accompanying felony or, in the alternative, is significant enough, standing alone, to support a conviction.

*Id.* at 578. Despite overruling *Anthony* and despite dismissing for a second time the "essentially incidental" test adopted by *Anthony*, the court determined that the requirement that the removal or confinement be more than essentially incidental to the other offense informs the "definition for the element of the offense requiring that the removal or confinement constitute a substantial interference with the victim's liberty." *Id.* Having thus concluded, the court ruled that, to protect the defendant's due process rights, the jury should be instructed that it must determine that the removal or confinement of the victim was "significant enough, standing alone" to support a conviction of kidnapping before imposing one when an overlapping felony accompanies the kidnapping charge. *Id.* The supreme court also developed a jury instruction to be provided to facilitate the juror's determination of

whether the removal or confinement was essentially incidental to the accompanying offense. *See id.* at 580-81. The court found that the *White* jury had not been instructed on the "key" element of false imprisonment,[1] that "substantial interference with the victim's liberty" required "a finding . . . that the victim's removal or confinement was not essentially incidental to the accompanying felony offense." *Id.* at 580. The supreme court granted White a new trial on the basis of the "instructional error." *Id.*[2]

## C. *Timing and Applicability*

Having recounted the history of the requirement first developed in *Anthony*, we must now determine whether the ruling in *White* is applicable to this case. The jury in this case, tried in 2011, was not provided with the instruction envisioned by our supreme court. In *White*, the supreme court classified its ruling as one that clarified existing law rather than "creating a new standard for kidnapping" and stated that the ruling "does not articulate a new rule of constitutional law or require retroactive application." *Id.* at 578. The court's statement that the ruling is not entitled to retroactive application would, at first blush, suggest that it is applicable only to those cases tried after March 9, 2012, the date on which the opinion was filed. We note, however, that the court has remanded a number of cases for reconsideration in light of its ruling in *White*, *see, e.g.*, *State v. Robert Fusco*, No. M2012-01724-SC-R11-CD (Tenn. Mar. 23, 2012), suggesting that it intended retroactive application of the ruling to those already-tried cases in the appellate pipeline, that is pending direct appeal, at the time it was filed and that its use of the word "retroactive" was intended to prevent use of the ruling for collateral attack. The court opted for similar, limited retrospective application of its ruling in *State v. Burns*, 6 S.W.3d 453, 471 (Tenn. 1999), a case that also involved jury instruction error. *Wiley v. State*, 183 S.W.3d 317, 327 (Tenn. 2006). Accordingly, we will utilize the ruling in *White* to analyze the issue presented here.

## D. *Application of White*

Having decided that the ruling in *White* is applicable to this case, we must next determine how that ruling should be applied here. As discussed, in *White*, our supreme court dispensed with the separate due process analysis required by *Anthony* and its progeny and

---

[1]The supreme court left the offense of false imprisonment out of the list of offenses for which the new instruction is required. We assume, however, that because substantial interference with liberty is a necessary element of false imprisonment, such an instruction is required for that offense when it is charged along with another felony.

[2]Interestingly, however, the instruction developed by the supreme court does not utilize the term "essentially incidental."

held that determination of guilt beyond a reasonable doubt "by a jury properly instructed under the law" followed by appellate review of the sufficiency of the convicting evidence safeguards the defendant's due process rights. *See White*, 362 S.W.3d at 577-78.

In making its ruling in *White*, however, our supreme court emphasized repeatedly that the question of whether the evidence has sufficiently established a separate kidnapping conviction is a question of fact to be determined by a "*jury properly instructed under the law*." *White*, 362 S.W.3d at 577, 579, 580 (emphasis added). Indeed, the court noted on four separate occasions that what had formerly been analyzed as a due process issue by the appellate courts was an issue *of fact* to be determined by a jury that was given the benefit of the instruction later crafted by the court. *See id.* Thus, the court classified the specific error in *White* as one of jury instruction error, ruling, "Because the jury was not properly instructed on the question of whether the victim's removal or confinement was essentially incidental to an accompanying felony, the Defendant is entitled to a new trial on the especially aggravated kidnapping charge." *Id.* at 580.

## 1. Fairly Raising the Issue

When the issue at hand is the omission of a jury instruction, the situation presented in both *White* and the present case, the appellate court's first task is to determine whether the evidence fairly raised the issue. In general, the trial court is obliged to instruct the jury on the rules of law that apply to the issues at trial. *Poe v. State*, 370 S.W.2d 488, 489 (1963). The duty of the trial court to charge the jury arises when an issue is fairly raised by the evidence. No duty to charge on that issue arises when the evidence fails to fairly raise it. *See State v. Williams*, 914 S.W.2d 940, 949 (Tenn. Crim. App. 1995); *State v. McPherson*, 882 S.W.2d 365, 374 (Tenn. Crim. App. 1994); *see also* T.C.A. § 39-11-203 (c) ("The issue of the existence of a defense is not submitted to the jury unless it is fairly raised by the proof."). The requirement of fairly raising an issue as a predicate for a jury instruction is keenly applicable when the issue is a matter of defense. *See State v. Hatcher*, 310 S.W.3d 788, 817 (Tenn. 2010) ("[I]f admissible evidence fairly raises . . . the applicability [of the general defense of duress], the trial court is required to submit the defense to the jury."); *see also State v. Blackmon*, 78 S.W.3d 322, 331 (Tenn. Crim. App. 2001) ("The threshold question of whether the defense of entrapment has been 'fairly raised' is for determination by the judge and not the jury. Nonetheless, where the proof fairly raises the issue of entrapment, and the proof is supported by credible evidence, the trial court is required to give the instruction of entrapment whether requested or not."); *State v. Townes,* 56 S.W.3d 30, 36 (Tenn. Crim. App. 2000) ("In the present case, the defenses of accident, necessity and self-defense were not fairly raised by the evidence."); *Moffitt v. State,* 29 S.W.3d 51, 57 (Tenn. Crim. App. 1999) ("We agree that the issue [of alibi] was fairly raised by the proof and it was for the jury to evaluate the credibility of the witnesses and decide this factual

issue."); *State v. Bult*, 989 S.W.2d 730, 733 (Tenn. Crim. App. 1998) ("[W]e conclude that the defense of necessity was not fairly raised. . . . Thus, the defendant was not entitled to instructions for the vandalism charge regarding the defenses he raises."); *State v. McPherson*, 882 S.W.2d 365, 374 (Tenn. Crim. App. 1994) ("The appellant was not entitled to an instruction on the defense of mistake of fact given the fact that it was not 'fairly raised' by the evidence. . . .").

We are aware that, in *White*, the court said that its first task in applying the rules to the facts of that case was to "determine whether the evidence presented in this case is sufficient to sustain a conviction [of] . . . kidnapping." *White*, 362 S.W.3d at 579. However, we think that the court had in mind determining the *adequacy* of evidence to fairly raise the issue of whether the removal of the victim constituted a substantial interference with her liberty. First, the determination of whether the issue is fairly raised is, as noted above, time-honored and traditional. Second, the court otherwise acknowledged that the sufficiency of the evidence could not be evaluated in the absence of proper jury instructions on the affected issue. Third, in concluding its remarks on this first task of review, the court said that the character of the victim's removal or confinement "could be interpreted in different ways[,] and[] therefore, the determination of whether the removal or confinement . . . constituted a substantial interference with her liberty was a question of fact for the jury to resolve." *Id*. This statement is strongly suggestive of the "fairly raised" language contained in the case law.[3]

---

[3]The use of the term of art "sufficiency of the evidence" imports a mandate of due process such that, when the convicting evidence is legally insufficient, the charge is dismissed. *See Jackson v. Virginia*, 443 U.S. 307, 324 (1979). Similarly, when the proof may be interpreted to support a conviction offense, as the court seemed to indicate in *White*, the conviction must be affirmed. *Id.* The grant of a new trial could never be the disposition of a question on the sufficiency of the evidence. Moreover, we cannot fathom that the *White* court intends to dismiss a charge of kidnapping based upon a finding that the evidence did not establish substantial interference vis-a-vis the elements of another charged – but overlapping – offense when the jury was not instructed to determine the character of such interference. Because the due process issue at stake is now deemed a factual issue to be determined by the trier of fact and not a legal issue to be determined by the trial court, *see White*, 362 S.W.3d at 577, an appellate court that embarks upon determining the "sufficiency of the evidence" on this issue despite the absence of the necessary, enabling instruction usurps the role of the trier of fact. Furthermore, even though the end result of an appeal may not depend upon the nicety of the process used, the appellate court should nevertheless strive to keep its processes of review in proper alignment. A review of the "sufficiency of the evidence" requires an assessment of the evidence in the light most favorable to the State, *see, e.g.*, *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003); contrarily, to determine whether the evidence fairly raises a defensive issue, "a court must, in effect, consider the evidence in the light most favorable to the defendant, including all reasonable inferences flowing from that evidence," *Blackmon*, 78 S.W.3d at 331; *Bult*, 989 S.W.2d at 733.

In the present case, we determine that the issue of whether the defendant substantially interfered with the victim's liberty in the face of companion charges of aggravated assault and attempted second degree murder was fairly raised by the evidence.

## 2. Determination of Error

Having determined that the evidence fairly raised the issue of whether the defendant substantially interfered with the victim's liberty apart from the other felony charges, we move on to the task of determining whether the trial court erred by failing to give the jury the instruction promulgated in *White*. This task is readily accomplished. The issue was fairly raised; yet, the court did not give the mandated instruction in this case that was tried in 2011 and on appeal when *White* was filed. Therefore, based upon the case law, the failure to instruct was error.

Our next task is to determine whether the error is reversible or is harmless beyond a reasonable doubt.

## 3. Harmless Error

To determine the harmfulness of the error, we still do not address the "sufficiency of the evidence" in the *Jackson* sense but evaluate the harmful effect of the absence of the required jury instruction. For this reason, we did not analyze the issue in this case as part of our analysis of the sufficiency of the evidence above but instead consider here the harmful effect of the trial court's failure to instruct the jury that the "key element – the substantial interference with the victim's liberty – [requires] a finding by the jury that the victim's removal or confinement was not essentially incidental to the accompanying felony offense." *White*, 362 S.W.3d at 580; *see also id.* n. 20 (indicating that the issue is subject to constitutional harmless error analysis by stating that remand for a new trial was warranted in *White* because the court could not "conclude beyond a reasonable doubt that the jury verdict would have been the same absent the instructional error").

The jury in this case was not instructed that it must find "that the victim's removal or confinement was not essentially incidental to the accompanying felony offense." Thus, the same jury instruction error that attended Jason Lee White's conviction exists here. Unlike the error in *White*, however, the error in this case can be classified as harmless beyond a reasonable doubt. Proof that the victim's removal or confinement went beyond that necessary to accomplish either of the accompanying felonies was overwhelming, and we conclude that the jury's verdict would have been the same had it been properly instructed.

-17-

*III. Sentencing*

Finally, the defendant contends that the trial court erred by imposing the maximum sentence for each offense and by ordering partially consecutive service of the sentence. The State asserts that the sentence is appropriate.

Initially, we have modified the defendant's conviction of especially aggravated kidnapping to a conviction of aggravated kidnapping. The trial court imposed sentences of 12 years for each of the defendant's other convictions of that offense, so we have no trouble imposing the same sentence for the newly-imposed aggravated kidnapping conviction.

Since the passage of the 1989 Sentencing Act, our standard of review when considering challenges to the length and manner of service of a sentence has been de novo review with a presumption that the determinations of the trial court are correct. T.C.A. § 40-35-401(d) (2006) ("When reviewing sentencing issues raised pursuant to subsection (a), including the granting or denial of probation and the length of sentence, the appellate court shall conduct a de novo review on the record of the issues. The review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct."). In 2005, the general assembly amended the Sentencing Act to bring our sentencing law into compliance with federal constitutional requirements as enunciated in *Blakely v. Washington*, 542 U.S. 296 (2004), and its progeny. Notably, the 2005 revisions rendered advisory the enhancement and mitigating factors and removed the presumptive sentence to be imposed by the trial court. *State v. Carter*, 254 S.W.3d 335, 345-46 (Tenn. 2008). In a number of cases following passage of the 2005 amendments, our supreme court signaled that the statutorily proscribed standard of review, de novo with a presumption of correctness, might be at odds with what had become a far more discretionary sentencing scheme. *See, e.g.*, *Carter*, 254 S.W.3d at 344, 346. In *State v. Cross*, 362 S.W.3d 512 (Tenn. 2012), the court again wrestled with the "the precise metes and bounds of appellate review under the current increased trial court discretion structure" but ultimately left the issue unsettled. *State v. Cross*, 362 S.W.3d 512, 529 (Tenn. 2012). The court visited the issue most recently in *State v. Susan Renee Bise*, ___ S.W.3d ___, No. E2011-00005-SC-R11-CD (Tenn. Sept. 26, 2012), and ultimately concluded that "although the statutory language continues to describe appellate review as de novo with a presumption of correctness," the 2005 revisions to the Sentencing Act "effectively abrogated the standard of appellate review." *State v. Susan Renee Bise*, ___ S.W.3d ___, No. E2011-00005-SC-R11-CD, slip op. at 29 (Tenn. Sept. 26, 2012). Observing that a change in our standard of review was necessary to comport with the holdings of the United States Supreme Court, our supreme court "adopt[ed] an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Id.* The court held that "sentences imposed

by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness'" afforded to sentencing decision of the trial court. *Id.*, slip op. at 30.

The supreme court observed, however, that in making its sentencing decision, a trial court must consider the principles of sentencing enumerated in Code section 40-35-210(b):

> (1) The evidence, if any, received at the trial and the sentencing hearing;
>
> (2) The presentence report;
>
> (3) The principles of sentencing and arguments as to sentencing alternatives;
>
> (4) The nature and characteristics of the criminal conduct involved;
>
> (5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
>
> (6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
>
> (7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

*see Susan Renee Bise*, ___ S.W.3d ___, slip op. at 19 (citing T.C.A. § 40-35-210(b)), 27 n. 41. By statute, the trial court must also consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." *Id.* § 40-35-103(5). The court cautioned that, despite the wide discretion afforded the trial court under the revised Sentencing Act, trial courts are "still required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Id.* (citing Tenn. Code Ann. § 40-35-210(e)). Thus, under the holding in *Susan Renee Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is

otherwise in compliance with the purposes and principles listed by statute." *Id.*, slip op. at 32.

Here, the trial court imposed the maximum sentence for each conviction, finding that the defendant had a history of criminal convictions in addition to that necessary to establish the appropriate range, *see id.* § 40-35-114(1); that the defendant failed to comply with a sentence involving release into the community, *see id.* § 40-35-114(8); and that the defendant was on bail at the time of the offenses, *see id.* § 40-35-114(13). The court imposed partially consecutive sentencing based upon its finding that the defendant was a dangerous offender, *see id.* § 40-35-115(b)(4), and that the defendant had an extensive record of criminal activity, *see id.* § 40-35-115(b)(2).

In our view, the trial court did not abuse its discretion when sentencing the defendant. The defendant terrorized the victim over the course of several hours while holding her prisoner in her own home. He beat and choked her, and threatened with her with death. The defendant committed the offenses while on bond from a pending charge of aggravated assault against the victim and while a valid order of protection prohibited him from having any contact with the victim. Although the trial court failed to make the required findings to support consecutive sentencing under the dangerous offender provision, the defendant's extensive criminal record spanning two decades is more than sufficient to warrant the imposition of partially consecutive sentences in this case.

*Conclusion*

The evidence is insufficient to support the defendant's conviction of especially aggravated kidnapping because the State failed to establish that the victim suffered serious bodily injury. Consequently, the defendant's conviction of especially aggravated kidnapping is modified to a conviction of aggravated kidnapping and the 25-year sentence imposed for especially aggravated kidnapping is modified to a sentence of 12 years. The judgments of the trial court are affirmed in all other respects.

_____
JAMES CURWOOD WITT, JR., JUDGE